**In re Raymond F. FOSCO, Jr., Debtor.**

**MECHANICS AND FARMERS SAVINGS BANK, Plaintiff,**

v.

**Raymond F. FOSCO, Jr., Defendant.**

Bankruptcy No. 5–81–369.
Adv. No. 205–5–81–0214.

United States Bankruptcy Court,
D. Connecticut.

Oct. 30, 1981.

---

Ronald J. Habansky, Bridgeport, Conn., for plaintiff.

James G. Verrillo, Zeisler & Zeisler, Bridgeport, Conn., for defendant.

## MEMORANDUM AND OPINION

### I

ALAN H. W. SHIFF, Bankruptcy Judge.

#### Background and Findings

The plaintiff filed a complaint pursuant to 11 U.S.C. § 523(a)(2)(A)[1] to determine the dischargeability of a debt alleged to be due from the defendant debtor. The defendant filed an answer denying the material allegations of the complaint. The facts necessary for an analysis and determination of the issues raised by the pleadings are found as follows.

On June 13, 1979, the defendant went to the plaintiff's bank and cashed a check issued by the Aetna Casualty and Surety Company and made payable to the order of "Ray Fosco, Jr., and GMAC, 8 Whalley Road, Trumbull, CT. 06611" in the amount

---

1. 11 U.S.C. § 523. *Exceptions to discharge*

   (a) A discharge . . . does not discharge an individual from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit by—

(A) false pretenses, a false representation, or actual fraud . . .

of $2,099.00. The check, dated June 11, 1979, represented an insurance payment for the total loss of the defendant's automobile which he had purchased 3½ weeks prior to the collision for $4,500.00 and financed through GMAC.

When the defendant presented the check to the plaintiff's teller, it had been endorsed "Ray Fosco, Jr. 8 Whalley Rd., Trumbull, Conn. 06611". The letters GMAC followed by a few indistinguishable initials appeared under the defendant's signature.

The defendant testified that when he opened the envelope containing the check, he noticed that GMAC's endorsement was already there. The defendant claimed that since the check was for such a small amount compared to what he had paid for the automobile a few weeks earlier, he thought that GMAC had been paid for its share of the collision loss by Aetna and had endorsed the check so that he could have the balance due after financing charges.

The plaintiff's supervisor testified that although it was the bank's usual procedure to deposit checks, drawn in the manner described above, until they had cleared, she approved payment because she knew the defendant and his parents as customers of the bank and had been assured by the defendant that GMAC had endorsed the check.

The check was ultimately dishonored and returned to the plaintiff because it was determined that GMAC's endorsement was forged. The plaintiff brings this adversary proceeding for a determination that the debt of the defendant in the amount of $2,099.00 is not dischargeable under the provisions of 11 U.S.C. sec. 523(a)(2)(A).

## II

### Discussion and Conclusions

Since section 523(a)(2)(A) is only slightly modified from its predecessor, section 17(a)(2) of the Bankruptcy Act of 1898, (11 U.S.C. sec. 35(a)(2) 1976), case law under the former statute as well as the legislative history of this code section are useful tools in construing its meaning and intended pur-

pose. See H.R.No.95–595, Cong., 1st Sess. 363 (1977); Sen.Rep.No.95–989, 95th Cong., 2nd Sess. 78 (1978), U.S.Code Cong. & Admin.News, p. 5787.

Under the act, the following test was applied to determine when a debt was nondischargeable under section 17(a)(2):

"(1) the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made."

In re Houtman, 568 F.2d 651, 655 (9th Cir. 1978) quoting In re Taylor, 514 F.2d 1370, 1373 (9th Cir. 1975); In re McGrath, 7 B.R. 496, 498 (S.D.N.Y.1980).

In the instant case, it is uncontested that the defendant represented to the plaintiff's supervisor that the check was properly signed and that the plaintiff suffered loss as a result of its reliance upon the defendant's representation. The conflict at trial centered on whether the defendant's representation was made with the intention to deceive the plaintiff and the nature of the plaintiff's reliance on that representation.

### A.

### Intentional False Representations Made with Intention of Deceiving The Plaintiff

■ The defendant's claim that he thought GMAC had endorsed the check is unbelievable. Even aside from the evidence that GMAC denied receiving the check, endorsing it or authorizing its endorsement, the claim asserted by the defendant is most improbable.

In order for GMAC to have endorsed the check it would have had to receive it before it was sent to the defendant. Such claim is rather incredible since the check was ad-

dressed to the defendant at his home address, and the defendant testified that when he opened the envelope sent by Aetna, the check had already been endorsed. Furthermore, how could GMAC have received its share of the settlement proceeds directly from Aetna, as claimed by the defendant, unless Aetna had sent GMAC two checks totaling a larger amount? Beyond the fact that the check in question was addressed to the defendant, Aetna would not know how to allocate the payments, and even if it did, the defendant's name would have appeared on GMAC's check just as GMAC was an additional payee on his. Such a duplication of effort is highly unlikely and the defendant's testimony that suggests such a procedure underscores the transparent quality of his claim. I accordingly conclude that the check in question was forged by or on behalf of the defendant and that the defendant made a false representation to the plaintiff with regard to the GMAC endorsement. I further conclude that at the time the defendant made the false representation, he knew that it was false and made the false statement with the intention of deceiving the plaintiff.

### B

### Reliance

■ The defendant next argues that even if he made a false representation, which he knew to be false and which was made with the intention of deceiving the plaintiff, his discharge should not be denied as to the debt created by his fraudulent conduct because the plaintiff has not proved that its reliance was "reasonable". This argument fails upon the application of law and fact.

2. 11 U.S.C. § 523. *Exceptions to discharge.*
(a) A discharge ... does not discharge an individual debtor from any debt—
(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit by—
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;

As a general proposition a decision is reasonable or unreasonable depending upon the facts and circumstances of a particular situation. In this instance, the plaintiff's supervisor accepted the assurance of a person she knew as a bank customer. The mere fact that she did not follow usual bank procedures in cashing the check does not necessarily mean the reliance was unreasonable. The plaintiff's supervisor was in a position to exercise discretion. She knew the defendant and his parents, and there was no evidence that she had any reason to distrust the defendant prior to June 13, 1979. The evidence fails to demonstrate that her reliance on the defendant's representation was unreasonable. Moreover, the defendant is hardly in a position— in this court of equity—to challenge the quality of the plaintiff's reliance, since it was his actual fraud which induced that reliance.

■ Furthermore, in arguing that the plaintiff's reliance must be reasonable, the defendant seeks to have that element of proof measured by the same standard as required by Code section 523(a)(2)(B),[2] which requires proof of reasonable reliance when the claim of nondischargeability is based on a false financial statement. An analysis of these two code subsections and their legislative history, as noted below, suggests, however, that the creditor who seeks to bar a discharge pursuant to 523(a)(2)(A) need only prove his actual reliance.

One of the few changes in 11 U.S.C. § 523(a)(2) from section 17(a)(2) of the old act is the addition of the word "reasonable" in subparagraph (B). H.R.No.95–595 Cong., 1st Sess. 364 (1977). According to the legislative history, this modification reflected the trend of court decisions.[3] Congress rec-

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

3. *But see Matter of Garman*, 625 F.2d 755, 6 B.C.D. 726 (7th Cir. 1980) which, in rejecting the legal sufficiency of the defendant's argument that the plaintiff's reliance on the defendant's false financial statements was unreason-

ognized the practice of creditors who would induce debtors into making false financial statements on which the creditors did not rely but hoped to obtain leverage against debtors with the threat of the exception to discharge. See H.R.No.95–595, Cong., 1st Sess. 130–31 (1977). The requirement of reasonable reliance under 523(a)(2)(B) makes abusive practices of this type less likely to succeed.

There is no indication in the legislative history that Congress likewise intended to give additional support to debtors by imposing a reasonableness requirement in section 523(a)(2)(A). Remarks from the Senate Debate on the Compromise Bill[4] make clear that subparagraphs (A) and (B) of section 523(a)(2) are not to be read as one.

> . . . Subparagraph (A) is intended to codify current case law e. g., Neal v. Clark, 95 U.S. 704, [24 L.Ed. 586] (1887), which interprets "fraud" to mean actual or positive fraud rather than fraud implied in law. Subparagraph (A) is mutually exclusive from subparagraph (B). Subparagraph (B) pertains to the so-called false financial statement. (emphasis added)

124 Cong.Rec. S17412 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini). The fraud required to render a debt nondischargeable according to Neal v. Clark, supra, involves "bad faith or immorality." Id. at 709, 24 L.Ed. 586.

Since a creditor under section 523(a)(2)(A) must show positive fraud and cannot base his claim on a false financial statement, there is little chance that a debtor will be made the unwitting victim of a creditor under this section. Consequently, the burden of proving reasonable reliance in section 523(a)(2)(B) to protect the debtor is not only left out of the language of section 523(a)(2)(A), but it cannot be justified by the policy concern expressed in the legislative history regarding false financial statements.

The issue evolves into a balancing of equities. While conduct is generally measured against a standard of what is reasonable, here, the conduct of an arguably negligent creditor is being weighed against a debtor who committed an intentional wrong. Should a debtor, who because of a relationship of trust succeeds in deceiving another, benefit by the discharge of the debt which is the product of that deception at the expense of his victim? I think not and accordingly reject the defendant's argument that a failure of the plaintiff to prove "reasonable" reliance on the defendant's misrepresentation entitles him to a discharge of the debt created by that deceit.

In nonbankruptcy contexts, it has been stated

> The better reasoned cases have rejected contributory negligence as a defense to intentional deceit, taking account of the effect which the representation is intended to have upon the plaintiff's mind.

Prosser, Law of Torts 716 (4th ed. 1971). Rather, the plaintiff is barred from recovery if he knows that the representation is false or the misrepresentation is obvious. See Restatement (Second) of Torts § 541 (1965). In other words, when the misrepresentation is so apparent that the plaintiff's conduct cannot be said to have been motivated by any reliance, the recovery is barred where reliance is an ingredient of proof in the plaintiff's case.

Under bankruptcy law, it is clear that the important benefits of the fresh start belong to the honest debtor, not all debtors, see Local Loan Company v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), and "certain problems . . . override the value of giving the debtor a wholly fresh start." Bruning v. United States, 376 U.S. 358, 361, 84 S.Ct. 906, 908, 11 L.Ed.2d 772 (1964). The function of section 523(a)(2)(A), both in discouraging fraud and providing relief for the victims of fraud, would be impeded by the imposition of a reasonable reliance standard. The burden on the creditor would be increased, yet the

able, interpreted decisions employing the word "reasonable" as only requiring actual reliance.

4. 124 Cong.Rec. S17403–34 (daily ed. Oct. 6, 1978).

debtor is no more honest because his victim was careless.

Although some decisions have stated without discussion that reliance must be reasonable under 523(a)(2)(A), *see e. g., In re Kojoyian*, 7 B.R. 719 (Bkrtcy., D.Mass. 1981); *In re Richards*, 7 B.R. 711 (Bkrtcy., S.D.Fla.1980); *Matter of Wise*, 6 B.R. 867, 7 B.C.D. 131 (Bkrtcy., M.D.Fla.1980), no court, having specifically found actual reliance and fraudulent intent, has allowed a debt to be discharged, because the plaintiff's reliance was not reasonable. As mentioned above, this does not imply that discharge will be denied when the creditor's reliance is so unreasonable as to be no reliance at all, but the debtor whose conduct is fraudulent under section 523(a)(2)(A) should not be discharged from his fraudulent debt when his victim's conduct was merely less than prudent. *See generally Matter of Garman*, 625 F.2d 755, 6 B.C.D. 726 (7th Cir. 1980).

For the reasons hereinabove set forth, I find that the claim of the Mechanics and Farmers Savings Bank is nondischargeable and grant judgment in favor of the plaintiff against the defendant debtor in the amount of $2,099.00.